## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND

**BRIANA WHYLIE,**
c/o Hansel  Law
2514 North Charles Street
Baltimore, Maryland 21218

     *Plaintiff*,

  v.

**MORGAN STATE UNIVERSITY,**
a State university,
1700 East Coldspring Lane
Baltimore, Maryland 21251

       Serve On:
       Office of the Attorney General
       Civil Litigation Division
       200 St. Paul Place
       Baltimore, Maryland 21202

and

**MORGAN STATE UNIVERSITY
BOARD OF REGENTS,**
1700 East Coldspring Lane
Truth Hall, Room 406
Baltimore, Maryland 21251

       Serve On:
       Office of the Attorney General
       Civil Litigation Division
       200 St. Paul Place
       Baltimore, Maryland 21202

and

**SEYMOUR E. CHAMBERS,**
as Chief Judicial Officer
Office of Student Rights and Responsibilities
(in his professional capacity)
McMechen Hall, Room 634
1700 East Coldspring Lane
Baltimore, Maryland 21251

**Case No.:** _25-01729_____

**\*Jury Trial Demanded\***

Serve On:
Office of the Attorney General
Civil Litigation Division
200 St. Paul Place
Baltimore, Maryland 21202

and

**KEVIN M. BANKS, Ed.D.,**
Vice President for Student Affairs
(in his professional capacity)
Holmes Hall, Room 231
1700 East Coldspring Lane
Baltimore, Maryland 21251

Serve On:
Office of the Attorney General
Civil Litigation Division
200 St. Paul Place
Baltimore, Maryland 21202

*Defendants*.

## COMPLAINT AND JURY DEMAND

COMES NOW Plaintiff, Briana Whylie, by and through attorneys Cary J. Hansel, Kristen M. Mack, and the law firm of Hansel Law, PC, and sues Defendants, Morgan State University, Morgan State University Board of Regents, Seymour E. Chambers, and Kevin M. Banks, and as cause therefore states as follows:

## INTRODUCTION

1.      In 2014, Plaintiff, Briana Whylie (hereafter, "Plaintiff" or "Ms. Whylie"), was a student at Defendant Morgan State University (hereafter "MSU" or the "University"), living two doors down the hall from another MSU student, Devon Washington (hereafter "Washington"), at the Morgan View University Apartments in Baltimore, Maryland.

2

2.      On March 1, 2014, Ms. Whylie was raped twice by Washington in her apartment. On March 20, 2014, Plaintiff reported the rape to MSU's Executive Director of the Office of Campus and Public Safety, and the MSU Campus Police.

3.      On April 15, 2014, the Office of Student Judicial Affairs held a disciplinary hearing, determining that Washington was not in violation of the University's Code of Student Conduct (Code).

4.      On May 14, 2014, Ms. Whylie submitted a complaint to the U.S. Department of Education Office for Civil Rights ("OCR") requesting assistance with the sexual assault she suffered during her time as a student at MSU.

5.      On April 16, 2024, nearly ten years after Ms. Whylie filed her OCR complaint, the OCR finally conveyed the findings of its investigation to Ms. Whylie.  After carefully considering all the information obtained during its investigation, OCR concluded MSU did not comply with the requirements of Title IX in responding to Ms. Whylie's complaint of sexual assault.

6.      Specifically, the OCR concluded that MSU did not provide Ms. Whylie with an equitable process, as MSU did not afford Ms. Whylie the same opportunity as Washington to provide witnesses and evidence at the disciplinary hearing, to question the witnesses, or to appeal the findings.

7.      OCR also concluded that, at the time Ms. Whylie filed her complaint, MSU did not have a designated Title IX Coordinator, nor did MSU appropriately publicize and disseminate the contact information for its non-existent Title IX Coordinator.

8.      OCR also concluded that, at the time Ms. Whylie filed her complaint, the University did not maintain equitable grievance procedures.

9.      Plaintiff has diligently and exhaustively pursued the administrative remedies available to her.

10.     The Equal Protection Clause prohibits the kind of discrimination Plaintiff suffered due to the Defendant's deliberate indifference and blatant disregard of Plaintiff's rights.

11.     The Due Process Clause prohibits the kind of discrimination Plaintiff suffered due to the Defendants' deliberate indifference and blatant disregard of Plaintiff's rights.

12.     Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681, *et seq.*) prohibits the kind of sex-based discrimination suffered by Plaintiff in any school or any other education program that receives funding from the federal government.

## JURISDICTION AND VENUE

13.     This Court has original federal question jurisdiction over Plaintiff's claims of violations of the United States Constitution and 42 U.S.C. § 1983, under 28 U.S.C. § 1331.

14.     This Court has federal question jurisdiction, under 28 U.S.C. § 1343 over Plaintiff's claims regarding the deprivation under color of state law of rights secured by the First and Fourteenth Amendments to the Constitution of the United States and the laws of the United States.

15.     This Court has supplemental jurisdiction over the state law and common law claims in this action, under 28 U.S.C. § 1367.

16.     This Court has personal jurisdiction over Defendants because Defendants Seymour E. Chambers and Kevin M. Banks reside and are employed in the State of Maryland, and Defendant MSU and Defendant Morgan State University Board of Regents (hereinafter "MSU Board of Regents") are entities of State of Maryland that, by virtue of Title 14 of the

Education Article of the Annotated Code of Maryland, are bodies corporate and politic which may sue and be sued.

17.    This Court has jurisdiction over Plaintiff's constitutional claims under 42 U.S.C. § 1983.

18.    Plaintiff's claims for declaratory relief are authorized by 28 U.S.C. §§ 2201 and 2202, 28 U.S.C. § 1343, by Rules 57 and 65 of the Federal Rules of Civil Procedure, and by the general, legal, and equitable powers of this Court.

19.    Plaintiff's claims for attorneys' fees and costs are predicated upon 42 U.S.C. §§ 1988 which authorize the award of attorneys' fees and costs to prevailing parties, under 42 U.S.C. § 1983.

20.    This lawsuit seeks damages under 42 U.S.C. § 1983.

21.    Venue is proper under 42 U.S.C. § 1391 as to the Defendants because Defendants operate within the geographical boundaries of the State of Maryland, and the substantial part of the acts described herein occurred within this District.

22.    Plaintiff provided notice to the State of Maryland of the nature of her claim on October 10, 2024, in compliance with the Maryland Tort Claims Act, State Gov't, § 12-101 *et seq.*, and all conditions precedent for the filing of this lawsuit have been met.

## PARTIES

23.    Plaintiff Briana Whylie is a 31-year-old resident of East Stroudsburg, Pennsylvania, and, at all times relevant to this Complaint, was a student at Defendant MSU.

24.    Defendant Morgan State University is an entity of State of Maryland that, by virtue of Title 14 of the Education Article of the Annotated Code of Maryland, is a body corporate and politic which may sue and be sued.  At all times relevant to this Complaint,

Defendant MSU was a recipient of both federal funding and funding from the State of Maryland. MSU was responsible for the policies, practices, customs, and regulations governing and used at MSU and for the misconduct, acts, and omissions of its employees, agents, or servants.

25.     Defendant Morgan State University Board of Regents is a 15-member board, as established under Title 14 of the Education Article, Annotated Code of Maryland. Defendant MSU is located in Baltimore City, Maryland. At all times relevant to this Complaint, the MSU Board of Regents was in charge of setting admission standards, reviewing and approving university policies, budgets, and establishing the regulatory framework within which MSU's individual units operate.

26.     Defendant Seymour E. Chambers (hereinafter "Chambers"), is an adult citizen of the United States and the State of Maryland and at all times relevant to this Complaint, served as the Chief Judicial Officer of the Office of Student Judicial Affairs at MSU whose conduct referred to herein was at all times relevant to his employment, and who is responsible for the pattern and practice of misconduct discussed herein and was at all times relevant hereto acting under color of state law.

27.     Defendant Kevin M. Banks (hereinafter "Banks"), is an adult citizen of the United States and, upon information and belief, the State of Maryland and at all times relevant to this Complaint, served as Vice President for Student Affairs at MSU whose conduct referred to herein was at all times relevant to his employment, and who is responsible for the pattern and practice of misconduct discussed herein and was at all times relevant hereto acting under color of state law.

28.     All Defendants are jointly and severally liable for damages and injuries to the Plaintiff described herein.

## STATEMENT OF FACTS

**Ms. Whylie Reports Sexual Violence to MSU.**

29.     In February 2014, Ms. Whylie was a sophomore at MSU.

30.     At that time, Ms. Whylie was loosely acquainted with Devon Washington ("Washington"), then a linebacker on the MSU football team, with a reputation for aggressive dealings with women on MSU's campus.

31.     Washington was in Ms. Whylie's physics class and lived a couple of apartments away from Ms. Whylie at the MSU Morgan View University Apartments.

32.     In order to live at Morgan View University Apartments, an individual must be a student at the University in good standing and the Complainant informed OCR that student resident rent for the apartment complex is paid through the University student portal.

33.     On the night of February 28, 2014, Ms. Whylie attended a party with her then roommate, Ms. Dawnaye Pinkett ("Pinkett"). At some time before 3:00 a.m. on March 1, 2014, Ms. Whylie and Pinkett returned to their apartment, and shortly thereafter, several of Pinkett's friends, including Washington, arrived at their apartment. Pinkett and Washington entered the kitchen and mixed beverages, while Ms. Whylie remained in the living room. When Pinkett and Washington returned to the living room, Pinkett poured the drink she and Washington had made into Ms. Whylie's cup. At no point did Pinkett or Washington drink from the mixture that was poured into Ms. Whylie's cup, nor did Ms. Whylie know what the drink contained. While Ms. Whylie was sitting on the couch texting her boyfriend, all the other visitors to her apartment, except Washington, went into Pinkett's room. Washington sat down next to Ms. Whylie and placed his head on Ms. Whylie's lap.

34.    Whylie was uncomfortable and asked Washington to get off her. Washington then began to grope her breasts and groin over her clothes. Ms. Whylie expressly told Washington, "No", and demanded that he stop, rebuking his aggressive and unwelcome sexual advances. Ms. Whylie told Washington to get off her. Ignoring Ms. Whylie's clear denial of consent to Washington's physical advances, Washington grabbed her jaw and forcefully tried to kiss her. Ms. Whylie said to Washington, "stop" and "this is rape." At that point, Washington temporarily stopped making advances toward Ms. Whylie and told her that he was going to say goodbye to everyone in Pinkett's room. Then, Ms. Whylie got up from the couch, went into her bedroom, turned on the light and television, and laid down on her bed. Ms. Whylie had a headache and felt lying down might help the headache go away. Ms. Whylie, still fully clothed, drifted off to sleep.

35.    As Ms. Whylie was about to fall asleep, Washington entered Ms. Whylie's room, locked the door behind him, and turned off the light. Washington, a football player standing at 5'10", was much taller and stronger than Ms. Whylie, who was 4'11". Washington was also much heavier than Ms. Whylie, weighing approximately 195 pounds, while she weighed 90 pounds. Utilizing his heft and weight, Washington climbed on top of Ms. Whylie in her bed, and without Ms. Whylie's consent, pinned her hands and arms behind her head with one hand, and removed her shirt, pants, and underwear with his other hand. Without Ms. Whylie's consent, Washington forcefully pushed his forearm into Ms. Whylie's chest to hold her down, rendering her immobile. Washington then put on a condom and, without Ms. Whylie's consent, aggressively and repeatedly forced his penis inside her vagina. Ms. Whylie, terrified and in severe pain, was scared that if she made attempts to resist Washington, he would become angry, more combative, or further physically injure her.

36.     On that night, Washington raped Ms. Whylie.

37.     After Washington raped Ms. Whylie, he picked up the two condoms off the floor, tied them together, and fell asleep.  Still afraid to do anything that might awaken or upset Washington, and fearing that he would rape her again, Ms. Whylie quietly got up, left the room, and took a shower.  In severe pain, Ms. Whylie stayed in the shower, feeling extremely dirty, dazed, and stunned.  Ms. Whylie saw that she was bleeding severely from her vagina so heavily that, once out of the shower, she had to put a pad in her underwear to absorb the blood.  Still frightened and physically shaking, Ms. Whylie returned to her room, woke Washington up, and commanded him to leave.  Washington told her "No" and went back to sleep.

38.     Later in the morning of March 1, 2014, Ms. Whylie saw that there was blood on Washington, on her mattress, and on her shirt.  Ms. Whylie bled for one to two weeks after the rape.  When Washington woke up, he picked up the two condoms that he had previously tied together and took them with him.  On the morning of March 1, 2014, Washington showed one of the condoms to one of his friends and bragged to others that he "had sex" with Ms. Whylie because he wanted to "score" that night.

39.     Approximately three days later, in the evening of March 4, 2014, someone knocked on Ms. Whylie's bedroom door.  Unaware it was Washington knocking, Ms. Whylie opened the door.  Her roommate, Pinkett, had let Washington into the apartment.  Washington pushed his way into Ms. Whylie's room and forcefully grabbed her.  Ms. Whylie told him to get out.  Instead, Washington grabbed Ms. Whylie's buttocks and forced her hand under his shirt to touch his chest.  Ms. Whylie told him to stop and said: "What you are doing is rape." Washington replied: "Why do you keep saying that?"  Ms. Whylie responded: "Because it is."  In an effort to get Washington to let go of her, Ms. Whylie said: "If you keep doing this, you could

get in trouble with football", and Washington replied: "I don't care."  Washington tried to force Ms. Whylie onto his lap.  Ms. Whylie repeatedly said: "Get off," and "Get out."  Washington ignored her demands.  Eventually, Washington's friend Lemay, who was visiting Pinkett, entered the room and asked if Ms. Whylie was okay.  Terrified of what Washington would do to her, Ms. Whylie looked down and nodded her head.  Lemay told Washington it was time to go, and Washington left.  Ms. Whylie immediately locked her door.

40.    On or about March 6, 2014, as Ms. Whylie arrived at her apartment, she saw Washington standing in the hallway, staring at his phone.  When Ms. Whylie unlocked the door to her apartment, Washington pushed the door open and went inside.  Pinkett was also there. Washington said to Pinkett: "Your short roommate is frontin'", and Pinkett told Washington to leave Ms. Whylie alone.  Ms. Whylie went to her room and locked the door behind her.

41.    For the next two weeks, twice a day, Washington came to Ms. Whylie's apartment, let in by Pinkett, and banged on Ms. Whylie's bedroom door, which Ms. Whylie kept locked.  When this occurred, Ms. Whylie tried to pretend that she wasn't there, and didn't respond.  Ms. Whylie became more and more frightened, upset, distraught and confused.  Ms. Whylie was afraid of Washington and, therefore, was afraid of leaving her apartment.  She became extremely withdrawn, stopped attending classes, and rarely left her room.

42.    On March 20, 2014, Ms. Whylie mentally broke down.  Ms. Whylie contacted her mother, Michelle George ("Ms. George") and told her what Washington had done to her.  Ms. George immediately reported the rape to Adrian Wiggins ("Wiggins"), Executive Director of the MSU Office of Campus and Public Safety.

**MSU Fails to Properly Adjudicate Ms. Whylie's Rape Allegations.**

43.    Later that day, the MSU Campus Police interviewed Ms. Whylie, and she provided a detailed account of the rape and Washington's other predatory conduct.

44.    Ms. Whylie's Incident Report, filed on March 20, 2014, with the MSU Police and Public Safety Department, comprehensively details the events of February 28, 2014 and March 1, 2014, citing criminal allegations against Washington for assault, harassment, and rape in the first degree.

45.    Feeling abandoned, discouraged, and frightened, Ms. Whylie left MSU and returned home to Pennsylvania to be with her parents on March 20, 2014.

46.    Subsequently, both Ms. Whylie and her mother, Ms. George, contacted Defendants Chambers and Banks, and MSU President, David Wilson, informing them of the sexual assault, with no response from any of them.

47.    On April 2, 2014, an MSU police officer and Baltimore City detective met with Washington at the Baltimore City Police Headquarters for an interview.

48.    Chambers had a pre-hearing meeting with Washington, but did not have a pre-hearing meeting with Ms. Whylie.

49.    On April 3, 2014, Chambers sent Washington a Notice of Violations of Code of Student Conduct, apprising him of Ms. Whylie's charges, and directing him to appear at a disciplinary hearing scheduled for April 15, 2014

50.    For many days, neither Ms. Whylie nor Ms. George received no response.

51.    On April 7, 2014 (or, 18 days after Ms. Whylie reported the rape to MSU), Chambers emailed and left a voicemail for Ms. Whylie, advising her, for the first time, that an administrative hearing would take place, scheduled for April 15, 2014.  Chambers concluded his

email to Ms. Whylie, stating: "Please feel free to contact me to confirm your attendance, and for any questions you may have."

52.    When Ms. Whylie called Chambers to ask questions on April 7, 2014, Chambers was essentially non-responsive.

53.    On a phone call on April 8, 2014, Ms. Whylie asked Chambers about the nature and extent of any investigation by MSU and asked about the upcoming hearing.  Ms. Whylie asked what protections, precautions, and/or accommodations MSU would provide to protect her, because she feared for her safety, specifically fearing retaliation from Washington and/or his football teammates.

54.    Ms. Whylie asked Chambers whether she could do a phone conference for the hearing.

55.    Chambers said that he would call her back.

56.    From April 8, 2014, to April 11, 2014, Ms. Whylie's parents repeatedly called MSU asking for information, support and security for their daughter.  Ms. Whylie's parents were ignored.

57.    MSU never provided Ms. Whylie with the information that she and her parents requested.

58.    Five days passed without any response from Chambers.

59.    On or about April 12, 2014, Ms. Whylie called Chambers again, leaving him a voicemail. Again, Chambers did not respond.

60.    At no time did Chambers or anyone else from MSU offer Ms. Whylie any further information about the investigation, hearing, or her options of security measures to keep her safe from retaliation.

61.     Chambers did not provide Ms. Whylie with the option to attend the judicial conference via video or phone.

62.     MSU never advised or consulted Ms. Whylie or her parents as to what witnesses were or should have been interviewed regarding the rape, whether prior incidents of Washington's aggressive misconduct either existed at the time of the rape or were discovered during MSU's investigation, or whether MSU collected and reviewed relevant evidence such as video surveillance footage, key card information, or phone records.

63.     At no time did MSU ask Ms. Whylie for a statement or a list of witnesses who might have information and the assault.

64.     MSU failed to inform Ms. Whylie or her parents whether MSU investigated the various discrepancies between Ms. Whylie's reports of the sexual assault and Washington's version of the events.  At the time, it was not known whether MSU engaged in any investigation of the incident at all.

65.     On April 15, 2014, a disciplinary hearing was held, in which a three-member board presided.  In addition, the University Advocate from the office of Student Judicial Affairs attended the hearing, along with Chambers, who served as the Judicial Board Advisor.

66.     Washington and two of his witnesses attended the hearing, but Ms. Whylie did not, due to her safety concerns.

67.     The only evidence that the University Advocate submitted to the hearing board were the police reports.

68.     Chambers admitted to the OCR that video recordings from the apartment building were not obtained until after the disciplinary hearing.

69.    MSU's police reports refer to text message exchanges between Ms. Whylie and Washington, but evidence of the text message exchanges was neither produced at the hearing, nor obtained after the hearing.

70.    On April 15, 2014, MSU issued a Notice of Decision that a "hearing" had been held, and MSU determined that Washington was not responsible for raping Ms. Whylie.  No sanctions were issued against Washington whatsoever.

**Ms. Whylie Seeks an Investigation from the Department of Education.**

71.    When Ms. Whylie received the Notice of Decision from Chambers, on April 15, 2014, she was horrified.  Upon receiving the Notice, Ms. Whylie emailed Chambers and Banks, expressing her disapproval of the outcome of the one-sided hearing.

72.    On April 15, 2014, Ms. Whylie called Chambers and left a voicemail, as did her mother, Ms. George.  Once again, neither Chambers nor anyone else at MSU responded.  With MSU failing to provide Ms. Whylie with any insight into an investigation, any protection, or any accommodations for her safety from Washington, Ms. Whylie felt she could not safely return to MSU's campus.  The hostile environment and harassment, perpetuated by MSU's deliberate indifference, was so severe, pervasive, and objectively offensive that Ms. Whylie felt she could no longer benefit from MSU's educational program.  On April 25, 2014, Ms. Whylie began the withdrawal process at MSU and did not return.

73.    Having failed to involve Ms. Whylie in the investigation and the hearing relating to her reports of sexual assault, MSU failed to conduct a fair, adequate, and impartial investigation into Ms. Whylie's reports of sexual assault and rape.

74.    Without such an investigation, MSU's hearing and determination were unjust toward Ms. Whylie, and in violation of Title IX.

75.     On May 1, 2014, Ms. Whylie withdrew from MSU.

76.     On May 14, 2014, Ms. Whylie submitted a complaint to the U.S. Department of Education Office for Civil Rights ("OCR") requesting assistance with the sexual assault she suffered during her time as a student at MSU.

77.     Prior to Ms. Whylie's report of rape in 2014, there were already eleven (11) known complaints filed with the Department of Education's Office of Civil Rights against MSU. These complaints alleged violations of federal law and detailed MSU's failure to appropriately handle reports of sexual assault, harassment, discrimination, and retaliation.

78.     Despite this history of sexual violence against women at MSU, MSU failed and refused to implement meaningful policies and procedures to protect student safety and rights under state and federal law.

79.     MSU's deliberate indifference, despite actual and repeated knowledge, led to an environment that condones and overlooks sexual assault.  This hostile environment, which MSU was aware of, led to Ms. Whylie being violently assaulted and raped.  It allowed her rapist to feel untouchable, permitting Washington to continue to repeatedly and aggressively harass Ms. Whylie on campus for weeks.  With nowhere to turn, and in a culture where victims of sexual assault were ignored or, at best, brushed aside, Ms. Whylie was forced to lock herself in her room for weeks, and had no choice but to leave MSU.

80.     Even after her report of a violent rape and weeks of harassment and assault, MSU, in violation of federal law, failed to report the assault to the MSU community.  Instead, MSU decided that the rapist was not an "active threat" to the campus.

81.    MSU's failure to follow federal and state law for several years, despite ongoing notice of a serious problem, has caused Ms. Whylie to suffer long-lasting and permanent damage.

**OCR's Findings of Discrimination under Title IX.**

82.    On April 12, 2024, nearly ten years after Ms. Whylie filed her complaint with the OCR, MSU entered into a Resolution Agreement with the OCR to resolve OCR Case No. 03-14-2324, to ensure compliance with Title IX's mandates, and Title IX's implementing regulation under 34 C.F.R. Part 106, signed by MSU President, Wilson.

83.    On April 16, 2024, over 10 years after Ms. Whylie reported that she was raped by another MSU student, Ms. Whylie finally received a 10-page conclusive report from the OCR (the "April 16, 2024 OCR Investigation Report"), informing her of the completion of its investigation into her complaint against MSU, in which Ms. Whylie alleged sex discrimination in MSU's failure to promptly and equitably respond to her report of sexual assault (OCR Case No. 03-14-2324).

84.    The OCR investigated whether MSU failed to promptly and equitably respond to complaints, reports, and/or incidents of sexual violence of which it had notice, including Ms. Whylie's report of sexual assault, and whether students, including Ms. Whylie, were subjected to a sexually hostile environment.  In conducting this investigation, OCR reviewed documents provided by Ms. Whylie and MSU, conducted focus groups, and interviewed Ms. Whylie and various MSU staff members.

85.    The April 16, 2024 OCR Investigation Report documents the OCR's conclusive, dispositive findings of MSU's sex discrimination against Ms. Whylie, including the following findings:

a. "After carefully considering all the information obtained during the investigation, OCR has concluded that the University did not comply with the requirements of Title IX in responding to your complaint of sexual assault." (p. 1).

b. "Specifically, OCR concludes that the University did not provide you with an equitable process as you were not afforded the same opportunity as the Respondent to provide witnesses and evidence at the hearing, to question the witnesses, or to appeal the findings." (pp. 1-2).

c. "OCR also concludes that, at the time that you filed your complaint with the University, **the University did not have a designated Title IX Coordinator**, nor did it appropriately publicize and disseminate the contact information for the Title IX Coordinator." (p. 2).

d. In addition, at the time you filed your complaint, **the University did not maintain equitable grievance procedures**." (p. 2).

e. "Finally, OCR has concerns that the University may have failed to provide an equitable grievance process for several other Title IX incidents reported in 2013 and 2014." (p. 2).

f. "As of November 10, 2014 and February 5, 2015, the University's website did not include any information regarding the name or contact information for its Title IX Coordinator." (p. 2).

g. OCR identified several deficiencies with the 2012 Student Code of Conduct (the Code). **Primarily, the Code provided due process rights only to the respondent**. Specifically, the Code provided that only the respondent would be provided with notice of the allegations and an opportunity to be heard. The Code provided that only respondents would be provided with a Notice of Violations, and then report to the Office of Student Judicial Affairs for a Judicial Conference. At the Judicial Conference, the respondent could plead responsible, or elect for a hearing. If the respondent pleaded responsible, the reporting party would have no input on the findings and/or sanctions. If the matter went to a hearing, the Code provided that only the respondent would be given notice of the hearing date and specific charges, although the Code did state that while hearings would be closed to the public, the reporting party would be permitted to attend. However, the Code also provided that only the respondent would be accorded an opportunity to question witnesses who testified at the hearing." (p. 3).

h. "[T]he Code provided that appeals were only permitted where the hearing resulted in expulsion or suspension, and only the respondent had the right to appeal the finding in those cases." (p. 3).

i. "On April 7, 2014, the Chief Judicial Officer emailed [Ms. Whylie] a Notice to Appear for the hearing. The Notice provided the date, time and location for the hearing, and stated that [Ms. Whylie] could bring supporting documents to submit into evidence for the board's consideration and that she could bring witnesses

17

with first-hand knowledge of the alleged event.  [Ms. Whylie] asserts that she called the Chief Judicial Officer that day and asked if it was necessary that she come to the hearing as she did not have a ride to campus, and she was concerned about seeing the Respondent at the hearing.  [Ms. Whylie] asserts that she therefore asked whether she could do a phone conference for the hearing. [Ms. Whylie] asserts that the Chief Judicial Officer said that he would call her back to let her know, but that he never did." (p. 5).

j.   The Chief Judicial Officer confirmed that [Ms. Whylie] called him in response to the Notice, and expressed apprehension about coming to the hearing, and stated that she would not have a ride to bring her to campus.  He conceded that [Ms. Whylie] was not provided with the option to attend the judicial conference via video or phone." (p. 5).

k.   "The Respondent and two of his witnesses attended the hearing, but [Ms. Whylie] did not, due to her concerns described above.  The only evidence that the University advocate submitted to the hearing board were the police reports.  The Chief Judicial Officer told OCR that video recordings from the apartment building were not obtained until after the hearing.  OCR also notes that the University police reports refer to text message exchanges between [Ms. Whylie] and the Respondent, but evidence of the text message exchanges was not produced at the hearing or obtained after the hearing." (p. 5).

l.   "OCR reviewed the audio recording of the hearing, which reflects that the University Advocate first gave an opening statement, and then the Respondent gave an opening statement.  The University Advocate then entered the police reports into evidence.  The University Advocate was then asked if he had any witnesses to call but the University Advocate stated that he did not.  The Respondent then provided a narrative of his side of the story, and then the Presiding Officer asked follow-up questions of the Respondent." (pp. 5-6).

m.   "After deliberations, the board determined, based upon a preponderance of the evidence, that the Respondent was not responsible for violating the Code of Student Conduct. On April 15, 2014, the Respondent.  The version of the Notice that was sent to the Respondent detailed the procedures for appealing the decision; the version that was sent to [Ms. Whylie] did not provide any information regarding appeals. [Ms. Whylie] responded via email, expressing her dissatisfaction with the outcome of the hearing. [Ms. Whylie] did not receive a response to her email."
(p. 6).

n.   "The University provided OCR with nine (10) case files of sexual harassment reports filed during 2013 or 2014 with the Student Judicial Affairs Office, the Diversity and EEO Office or the University police.  Six (6) complaints of student-on-student sexual harassment were processed by the Student Judicial Affairs Office; two (2) complaints of employee-on-student sexual harassment were processed by the Diversity and EEO Office; and one (1) complaint of sexual

harassment by a third party towards a student was received by University police. (p. 6).

o.   "Regarding the incident reported to University police, the only documentation provided to OCR was the police report.  There is no evidence that University police referred the incident to the Student Judicial Affairs office or the Diversity and EEO office and, thus, there is no evidence that the University conducted an investigation pursuant to Title IX and did not offer support to [Ms. Whylie] (Incident 10)." (p. 6).

p.   "While the University maintained adequate record-keeping for several incidents of sexual harassment and assault reported during 2013 and 2014, as noted above, all the documentation provided to OCR for the one complaint received by University police was the police report.  Further, in several incidents, the University did not provide any documentation to OCR to reflect that [Ms. Whylie] was provided notice of the outcome of the University's determination regarding the reported incident (Incident 1, 2, 5 and 6).  OCR also notes that in several incidents, the University did not provide any documentation of interim or remedial measures provided to [Ms. Whylie] (Incident 1, 2, 3, 5 and 8).  Further, OCR has concerns that in several of the reported incidents, although the documentation reflects that the respondent engaged in sexual harassment and/or assault, the respondent was charged with disruptive, disorderly or reckless conduct (Incident 1, 4 and 5) and not with sexual harassment or assault.  In one incident, OCR has concerns that the University did not conduct an internal investigation while it waited one month to learn that the State Attorney's Office had declined to prosecute the case, and another month for University police to fax a copy of the police report to judicial affairs.  Further, there is no documentation in the file showing whether the University conducted an investigation following receipt of the police report.  (Incident 7).  Last, in Incident 3, [Ms. Whylie] reported subsequent harassing conduct and it does not appear from the documentation that the University responded or investigated this report." (pp. 6-7).

q.   "OCR concludes that the University did not comply with the requirements of Title IX when it failed to provide an equitable grievance process for [Ms. Whylie].  Specifically, the evidence shows that [Ms. Whylie] expressed reservations to the University about seeing the Respondent at the hearing, to which the University did not offer any accommodations for [Ms. Whylie] to participate without being in the presence of the Respondent.  As a result, [Ms. Whylie] was unable to meaningfully participate in the grievance process for her complaint.  Further, even if she had attended the hearing, the Code of Conduct in effect at the time did not provide the reporting party with any opportunity to meaningfully participate in the hearing by providing evidence, witnesses, and opening or closing statement or an opportunity to question the witnesses.  OCR also concludes that the University failed to obtain timely and relevant evidence for the hearing, including video recordings from the night of the incident, and relevant text messages.  Last, the evidence reflects that [Ms. Whylie] was never provided with an equal opportunity

to appeal the findings.  As such, OCR concludes that the University failed to comply with the requirements of Title IX by denying [Ms. Whylie] an equitable investigation and resolution of her complaint of sexual assault." (p, 8).

86.     On May 30, 2024, MSU offered Ms. Whylie an individual remedy, pursuant to the April 12, 2024, Resolution Agreement between MSU and the OCR, only offering to reimburse Ms. Whylie for "any out-of-pocket counseling costs [Ms. Whylie] incurred during the academic years 2013-2014 and 2014-2015[,]" and requesting proof of payment for such counseling costs within 60 days.

87.     On July 29, 2024, in light of the clear Title IX violations committed by Defendants, determinatively divulged in the April 16, 2024, OCR Investigation Report, Ms. Whylie rejected the May 30, 2024, offer from MSU.

88.     For over ten years, from March 20, 2014, through July 29, 2024, Ms. Whylie has diligently pursued the administrative remedial avenues available to her, has carefully considered the paltry administrative remedy offered to her, and now brings this private cause of action against Defendants.

## COUNT I
### 42 U.S.C. § 1983 EQUAL PROTECTION CLAUSE
### Fourteenth Amendment to the United States Constitution

89.     Plaintiff adopts and incorporates by reference each and every allegation contained in the foregoing paragraphs verbatim with the same effect as if herein fully set forth.

90.     The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution prohibits a state from "deny[ing] to any person within its jurisdiction the equal protection of the laws."

91.     Defendant MSU is a governmental entity subject to Section 1983 and the Fourteenth Amendment of the U.S. Constitution.

92.    According to the Nation Sexual Violence Resource Center, 81% of women and 43% of men reported experiencing some form of sexual harassment and/or assault in their lifetime.

93.    According to the National Sexual Violence Resource Center, 91% of the victims of rape and sexual assault are female, and 9% are male.

94.    Because women are at a much higher risk of sexual harassment, sexual assault, and rape, Defendants' inequitable grievance procedures placed Plaintiff and other female students at a cognizably higher risk of having their reports of sexual assault go unaddressed.

95.    Sexual harassment can create a hostile educational environment based on sex when the harassment is sufficiently serious to deny or limit the individual's ability to participate in or benefit from the recipient's education program or activity.

96.    Plaintiff was directly discriminated against based on her sex, because she was not afforded equal protection under the laws, while her assailant, a male student, was afforded greater protection under the laws.

97.    Defendants' unlawful actions caused Plaintiff harm and Plaintiff is entitled to declaratory relief, compensatory and punitive damages, in addition to all such other relief this Court deems just and proper including costs and attorneys' fees in this action.

WHEREFORE, Plaintiff demands judgment against Defendants in an amount to be determined at trial, but in excess of $75,000.00 plus interest, costs and attorneys' fees, and punitive damages, in an amount to be determined at trial, and such other and further relief as the nature of the case requires including, but not limited to, declaratory and injunctive relief declaring the conduct which is the subject of the Complaint unlawful and unconstitutional and enjoining future unlawful and unconstitutional misconduct of the same type.

## <u>COUNT II</u>
## 42 U.S.C. § 1983 DUE PROCESS CLAUSE
### Violation of the Fourteenth Amendment to the United States Constitution

98.    Plaintiff adopts and incorporates by reference each and every allegation contained in the foregoing paragraphs verbatim with the same effect as if herein fully set forth.

99.    The Due Process Clause of the Fourteenth Amendment to the United States Constitution protects people from being deprived of life, liberty, or property without due process of law.

100.    The Due Process Clause of the Fourteenth Amendment requires the opportunity to be heard at a meaningful time and in a meaningful manner.

101.    At all times relevant, Plaintiff had a clearly established property right in accessing the full educational opportunities and benefits offered by MSU.

102.    Defendants did not provide Plaintiff with an equitable process, as Plaintiff was not afforded the same opportunity as Washington to provide witnesses and evidence at the hearing, to question the witnesses, or to appeal the findings

103.    At all times relevant to this Complaint, Defendants' policies provided that appeals were only permitted where the hearing resulted in expulsion or suspension, and only the respondent had the right to appeal the finding in those cases

104.    MSU's official policies, at all times relevant, violated the Due Process Clause, as MSU did not have a designated Title IX Coordinator, did not appropriately publicize and disseminate the contact information for a Title IX Coordinator, did not maintain equitable grievance procedures, and failed to provide an equitable grievance process for several Title IX incidents reported in 2013 and 2014, including Plaintiff's reported incident.

105.     Defendants' failures to maintain an equitable grievance process subjected Plaintiff to an arbitrary governmental deprivation of her liberty and property interests.

106.     Defendants' unlawful actions caused Plaintiff harm, and Plaintiff is entitled to declaratory relief, compensatory and punitive damages, in addition to all such other relief this Court deems just and proper including costs and attorneys' fees in this action.

WHEREFORE, Plaintiff demands judgment against Defendants in an amount to be determined at trial, but in excess of $75,000.00 plus interest, costs and attorneys' fees, and punitive damages, in an amount to be determined at trial, and such other and further relief as the nature of the case requires including, but not limited to, declaratory and injunctive relief declaring the conduct which is the subject of the Complaint unlawful and unconstitutional and enjoining future unlawful and unconstitutional misconduct of the same type.

### COUNT III
### 20 U.S.C. § 1681 TITLE IX OF THE EDUCATION AMENDMENT OF 1972
### Pre-Assault Liability

107.     Plaintiff adopts and incorporates by reference each and every allegation contained in the foregoing paragraphs verbatim with the same effect as if herein fully set forth.

108.     Sexual harassment is a form of sex discrimination.  Sexual harassment can include unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature, such as sexual assault or acts of sexual violence.

109.     Sexual harassment can create a hostile educational environment based on sex when the harassment is sufficiently serious to deny or limit the individual's ability to participate in or benefit from the recipient's education program or activity.

110.     Defendant MSU, at all times relevant, was and continues to be a recipient of federal funding and state funding.

23

111.    The April 16, 2024 OCR Investigation Report confirms that, at all times relevant, MSU had no Title IX Coordinator and offered no Title IX training at all—despite its history of reports of sexual violence on campus.

112.    At no time did any MSU employee put Ms. Whylie or her family in contact with the MSU Title IX Coordinator or even advise that one existed.

113.    At no time did any MSU employee suggest that Ms. Whylie be tested for drugs that Washington may have administered to her.

114.    According to the April 16, 2024 OCR Investigation Report, MSU had few policies or procedures implementing the government's statutory requirements under Title IX.

115.    MSU was deliberately indifferent to its obligation to investigate the rape of Ms. Whylie.

116.    MSU was deliberately indifferent in its failure to uphold Ms. Whylie's rights to participate in the investigation.

117.    MSU provided no information to Ms. Whylie regarding her Title IX rights.

118.    MSU provided no information to Ms. Whylie to report to its Title IX Coordinator, because MSU did not even have a Title IX Coordinator at the time.

119.    MSU failed to instruct or advise Ms. Whylie how to report a sexual assault, or where to report the rape.

120.    MSU's official policies, at all times relevant, exhibited deliberate indifference to sexual assaults on campus, as MSU did not have a designated Title IX Coordinator, did not appropriately publicize and disseminate the contact information for a Title IX Coordinator, did not maintain equitable grievance procedures, and failed to provide an equitable grievance process for several other Title IX incidents reported in 2013 and 2014.

121.    Defendants are liable to Plaintiff for the actions of third parties under Title IX because Defendants exercised substantial control over the MSU campus, policies and procedures, severe and discriminatory harassment was reported, Defendants had actual knowledge of the reports of sexual violence, and Defendants exhibited deliberate indifference to addressing third-party sexual violence committed against Plaintiff and other MSU students, as required by Title IX.

122.    Defendants maintained an official policy supporting a heightened risk of sexual assault on campus, by maintaining a policy of deliberate indifference to reports of sexual misconduct, which created a heightened risk of sexual harassment that was known or obvious in a context subject to the school's control.

123.    As a result, Plaintiff suffered acts of sexual violence and harassment so severe, pervasive, and objectively offensive that it deprived the Plaintiff of access to the educational opportunities or benefits provided by the school.

124.    Defendants' unlawful actions caused Plaintiff harm and Plaintiff is entitled to declaratory relief, compensatory and punitive damages, in addition to all such other relief this Court deems just and proper including costs and attorneys' fees in this action.

WHEREFORE, Plaintiff demands judgment against Defendants in an amount to be determined at trial, but in excess of $75,000.00 plus interest, costs and attorneys' fees, and punitive damages, in an amount to be determined at trial, and such other and further relief as the nature of the case requires including, but not limited to, declaratory and injunctive relief declaring the conduct which is the subject of the Complaint unlawful and unconstitutional and enjoining future unlawful and unconstitutional misconduct of the same type.

## COUNT IV
### NEGLIGENCE

125.    Plaintiff adopts and incorporates by reference each and every allegation contained in the foregoing paragraphs verbatim with the same effect as if herein fully set forth.

126.    Under Maryland law, a negligence claim lies where a legal duty is owed by a defendant to a plaintiff, a breach of that duty occurs, actual injury to the plaintiff occurs, and a causal link between the breach and the injury is demonstrated.

127.    Defendants incurred a duty under negligence law because their deliberate indifference to reports of sexual violence, at all times relevant, created a foreseeable, unreasonable risk of injury to Plaintiff, and Defendants could have foreseen the risk through investigation as a reasonable person.

128.    Defendants breached their duty to minimize the risk of sexual assaults on campus, exhibiting a deliberate indifference to known sexual assaults on campus, not having a designated Title IX Coordinator, not appropriately publicizing and disseminating contact information for a Title IX Coordinator, not maintaining equitable grievance procedures, and failing to provide an equitable grievance process for Plaintiff and several other students' reports of sexual violence in 2013 and 2014.

129.    Defendants' breach of duty of care, via Defendants' unlawful actions and deliberate indifference to a known, pervasive risk of sexual assault on campus, caused actual injury to Plaintiff.

130.    As a result of Defendants' breach, Plaintiff has been harmed, and is entitled to declaratory relief, compensatory and punitive damages, in addition to all such other relief this Court deems just and proper including costs and attorneys' fees in this action.

131.    WHEREFORE, Plaintiff demands judgment against Defendants in an amount to be determined at trial, but in excess of $75,000.00 plus interest, costs and attorneys' fees, and punitive damages, in an amount to be determined at trial, and such other and further relief as the nature of the case requires including, but not limited to, declaratory and injunctive relief declaring the conduct which is the subject of the Complaint unlawful and unconstitutional and enjoining future unlawful and unconstitutional misconduct of the same type.

## COUNT V
## BREACH OF CONTRACT

132.    Plaintiff adopts and incorporates by reference each and every allegation contained in the foregoing paragraphs verbatim with the same effect as if herein fully set forth.

133.    Defendant MSU is a recipient of federal and state funding.

134.    Title IX of the Education Amendments Act of 1972 is a statutory scheme authorized by the Spending Clause of Article I of the Constitution of the United States.

135.    The contractual nature of the Spending Clause, as it related to antidiscrimination statutes, operates based on consent, meaning that, in return for receiving federal funds covered entities, such as Defendant MSU, agree to comply with federally imposed conditions.

136.    Defendant MSU is an entity receiving federal funds, that voluntarily and knowingly accepted the terms of its contractual relationship for funding, and, at all times relevant to this Complaint, was aware of the penalties it may be subject to, in the event of a breach the contract.

137.    At all times relevant to this Complaint, Defendant MSU, a federal funding recipient, was on notice that it would be liable for such damages to Plaintiff, as a result of breaching its contract with the federal government.

138.    Defendant MSU breached its contract by failing to comply with federally imposed conditions, exhibiting a deliberate indifference to known sexual assaults on campus, not having a designated Title IX Coordinator, not appropriately publicizing and disseminating contact information for a Title IX Coordinator, not maintaining equitable grievance procedures, and failing to provide an equitable grievance process for Plaintiff and several other students' reports of sexual violence in 2013 and 2014.

139.    Defendants' unlawful actions caused Plaintiff harm and Plaintiff is entitled to declaratory relief, compensatory and punitive damages, in addition to all such other relief this Court deems just and proper including costs and attorneys' fees in this action.

140.    WHEREFORE, Plaintiff demands judgment against Defendants in an amount to be determined at trial, but in excess of $75,000.00 plus interest, costs and attorneys' fees, and punitive damages, in an amount to be determined at trial, and such other and further relief as the nature of the case requires including, but not limited to, declaratory and injunctive relief declaring the conduct which is the subject of the Complaint unlawful and unconstitutional and enjoining future unlawful and unconstitutional misconduct of the same type.

## COUNT VI
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

141.    Plaintiff adopts and incorporates by reference each and every allegation contained in the foregoing paragraphs verbatim with the same effect as if herein fully set forth.

142.    Defendants intentionally failed to minimize the risk of sexual assaults on campus, exhibiting a deliberate indifference to known sexual assaults on campus, not having a designated Title IX Coordinator, not appropriately publicizing and disseminating contact information for a Title IX Coordinator, not maintaining equitable grievance procedures, and failing to provide an

equitable grievance process for Plaintiff and several other students' reports of sexual violence in 2013 and 2014.

143.    Defendants extreme and outrageous conduct was intended to cause severe emotional distress.

144.    Defendants' acts caused severe emotional distress and injury to Plaintiff.

145.    Defendants' unlawful actions caused Plaintiff harm and Plaintiff is entitled to declaratory relief, compensatory and punitive damages, in addition to all such other relief this Court deems just and proper including costs and attorneys' fees in this action.

WHEREFORE, Plaintiff demands judgment against Defendants in an amount to be determined at trial, but in excess of $75,000.00 plus interest, costs and attorneys' fees, and punitive damages, in an amount to be determined at trial, and such other and further relief as the nature of the case requires including, but not limited to, declaratory and injunctive relief declaring the conduct which is the subject of the Complaint unlawful and unconstitutional and enjoining future unlawful and unconstitutional misconduct of the same type.

## PRAYER FOR RELIEF

Plaintiff requests that this Honorable Court enter judgment in her favor and against Defendants, and enter an Order awarding the following relief:

1.    A declaratory judgment that:

a.    Defendants exhibited deliberate indifference to known sexual assaults on campus, not having a designated Title IX Coordinator, not appropriately publicizing and disseminating contact information for a Title IX Coordinator, not maintaining equitable grievance procedures, and failing to provide an equitable grievance process for Plaintiff and several other students' reports of sexual violence in 2013 and 2014;

b.    Defendants knowingly failed to investigate Plaintiff's reports of sexual assault, as well as several other reports of sexual violence on campus;

     c.     Defendants discriminated against Plaintiff on the basis of her sex in failing to maintain equitable grievance procedures, failing to provide an equitable grievance process, and failing permit her accommodations and a fair hearing relating to her sexual assault;

     d.     Defendants' acts, failures to act, and deliberate indifference violate the clear mandates and regulations of Title IX, and created a heightened risk of sexual assaults on campus; and

     e.     Defendants' unlawful actions caused Plaintiff harm, damages, and severe emotional distress.

2.     An award of compensatory and punitive damages against Defendants under 42 U.S.C. § 1983;

3.     An award of all compensatory and punitive damages allowed by statute, common law, or otherwise in an amount in excess of $75,000;

4.     An award of attorneys' fees, costs, and expenses of all litigation under 42 U.S.C. § 1988; and

5.     Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a jury trial as to all claims so triable.

     Respectfully submitted,

     HANSEL LAW, P.C.

     */s/ Kristen Mack*
     Cary J. Hansel (Bar No.: 14722)
     Kristen M. Mack (Bar No.: 30349)
     2514 North Charles Street
     Baltimore, Maryland 21218
     Phone: (301) 461-1040
     Fax: (443) 451-8606
     cary@hansellaw.com
     kmack@hansellaw.com
     *Counsel for Plaintiffs*