IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

BRIANA WHYLIE,                          *

    Plaintiff,                          *

v.                                      *          Civil Action No. GLR-25-1729

MORGAN STATE UNIVERSITY, et             *
al.,
                                        *
    Defendants.
                                     ***

**MEMORANDUM OPINION**

THIS MATTER is before the Court on Defendants Morgan State University (the "University"), Morgan State University Board of Regents (the "Board"), Seymour Chambers, and Kevin Banks' (collectively, "Defendants") Motion to Dismiss (ECF No. 32).[1] The Motion is ripe for disposition, and no hearing is necessary. See Local Rule 105.6 (D.Md. 2025). For the reasons set forth below, the Court will grant the Motion.

## I.    BACKGROUND[2]

In early 2014, Plaintiff Briana Whylie was a sophomore at Morgan State University, living at the Morgan View University Apartments with her roommate Dawnaye Pinkett. (Compl. ¶¶ 1, 29, 33, ECF No. 1). Devon Washington, a linebacker on the University's

---

[1] Also pending before the Court is Plaintiff Briana Whylie's unopposed Motion for Leave to File in Excess of Thirty Pages in reference to her Opposition to Defendants' Motion to Dismiss. (ECF No. 36). Because this Motion is unopposed, and Whylie's Opposition exceeds the page limit by only eight pages, the Court will grant the Motion.

[2] Unless otherwise noted, the Court takes the following facts from the Complaint (ECF No. 1) and accepts them as true. See Erickson v. Pardus, 551 U.S. 89, 94 (2007).

football team with "a reputation for aggressive dealings with women on [the University's] campus," lived down the hall from Wylie and Pinkett. (Id. ¶¶ 1, 30).

On the night of February 28, 2014, Whylie and Pinkett attended a party together. (Id. ¶ 33). They returned to their apartment sometime before 3:00 a.m. the next morning, March 1, 2014, and several of Pinkett's friends, including Washington, joined them shortly thereafter. (Id.). While at their apartment, Washington touched and grabbed Whylie inappropriately, despite her clear demands to "stop" and to "get off her." (Id. ¶¶ 33–34). Though Washington stopped, temporarily, he later entered Whylie's room, pinned her down, and raped her twice. (Id. ¶¶ 2, 34–36). Whylie experienced severe pain and bleeding as a result. (Id. ¶¶ 37–38).

For the next two weeks, Washington terrorized Whylie by coming to her apartment, where Pinkett would allow him to enter, and banging on Whylie's bedroom door. (Id. ¶ 41). Whylie became frightened and withdrawn, too afraid to leave her room. (Id.). Eventually, on March 20, 2014, Whylie "broke down." (Id. ¶ 42). She called her mother, Michelle George, and told her about the assault. (Id.). George reported the rape immediately to Adrian Wiggins, the Executive Director of the University's Office of Campus and Public Safety. (Id.). The Campus Police interviewed Whylie that same day, and "she provided a detailed account of the rape and Washington's other predatory conduct." (Id. ¶ 43). The resulting Incident Report cites criminal allegations against Washington for assault, harassment, and first-degree rape. (Id. ¶ 44).

Whylie left the University on March 20, 2014, to stay with her parents in Pennsylvania. (Id. ¶ 45). She and George later contacted Defendant Seymour Chambers,

then-Chief Judicial Officer for the Office of Student Rights and Responsibilities; Defendant Kevin Banks, then-Vice President of Student Affairs; and David Wilson, then-President of the University, to inform them of the assault. (Id. ¶ 46; see also id. at 1–2).[3] None of them responded. (Id. ¶ 46).

On April 2, 2014, a University police officer and Baltimore City detective interviewed Washington at the Baltimore City Police Headquarters. (Id. ¶ 47). Chambers also had a "pre-hearing meeting" with Washington, but he had no such meeting with Whylie. (Id. ¶ 48). On April 3, 2014, Chambers sent Washington a Notice of Violations of Student Code of Conduct, informing him of Whylie's charges against him and directing him to appear at a disciplinary hearing on April 15, 2014. (Id. ¶ 49).

On April 7, 2014, Chambers reached out to Whylie via email and phone, "advising her, for the first time, that an administrative hearing would take place" on April 15, 2014. (Id. ¶ 51). Whylie called Chambers on April 7, 2014, to ask questions, as Chambers' email invited her to do, but "Chambers was essentially non-responsive." (Id. ¶¶ 51–52). Whylie spoke with Chambers over the phone the next day. (Id. ¶ 53). She asked "about the nature and extent of any investigation" by the University; the upcoming hearing; "what protections, precautions, and/or accommodations [the University] would provide to protect her, because she feared for her safety"; and whether she could attend the hearing remotely. (Id. ¶¶ 53–54). Chambers said he would call Whylie back, but he never did, despite

---

[3] Unless otherwise noted, citations to page numbers refer to the pagination assigned by the Court's Case Management/Electronic Files ("CM/ECF") system.

Whylie's and her parents' attempts to obtain more information. (Id. ¶¶ 55–64). Consequently, Whylie received no information regarding the University's investigation, the hearing, or any safety measures the University would implement for Whylie, and she was not given the option to attend the hearing remotely. (Id. ¶¶ 60–64).

On April 15, 2014, a three-member board presided over the disciplinary hearing. (Id. ¶ 65). The University Advocate from the Office of Student Judicial Affairs and Chambers, as the Judicial Board Advisor, attended the hearing. (Id.). Washington also attended the hearing with two of his witnesses. (Id. ¶ 66). Whylie did not attend due to her safety concerns. (Id.). The University Advocate submitted the police reports as evidence, but nothing more. (Id. ¶ 67). One report referenced text messages between Whylie and Washington, but those messages were not produced at the hearing or obtained afterward. (Id. ¶ 69). Additionally, as Chambers would later admit to the United States Department of Education's Office of Civil Rights ("OCR"), video recordings from Whylie and Washington's apartment building were not obtained until after the hearing. (Id. ¶ 68). The University issued its Notice of Decision that same day, concluding that "Washington was not responsible for raping Ms. Whylie." (Id. ¶ 70).

After receiving the Notice of Decision, Whylie emailed Chambers and Banks and left a voicemail with Chambers, "expressing her disapproval of the outcome of the one-sided hearing." (Id. ¶ 71–72). "[N]either Chambers nor anyone else at [the University] responded." (Id. ¶ 72). In light of Defendants' "indifference" and the outcome of this "one-sided hearing," Whylie no longer felt safe at the University and ultimately withdrew from the school on May 1, 2014. (Id. ¶¶ 71–75).

On May 14, 2014, Whylie filed a complaint with the OCR, "requesting assistance with the sexual assault she suffered during her time as a student at" the University. (Id. ¶ 76). Whylie's was the twelfth complaint of this kind filed against the University for "failure to appropriately handle reports of sexual assault, harassment, discrimination, and retaliation." (Id. ¶ 77).

Nearly ten years after Whylie filed her complaint, on April 12, 2024, the University entered into a Resolution Agreement with the OCR. (Id. ¶ 82). Whylie received an investigation report from the OCR on April 16, 2024, advising her that it had completed its investigation. (Id. ¶ 83). The report outlined the OCR's investigation, findings, and conclusion that:

> the University did not comply with the requirements of Title IX when it failed to provide an equitable grievance process for [Whylie]. Specifically, the evidence shows that [Whylie] expressed reservations to the University about seeing the Respondent at the hearing, to which the University did not offer any accommodations for [Whylie] to participate without being in the presence of the Respondent. As a result, [Whylie] was unable to meaningfully participate in the grievance process for her complaint. Further, even if she had attended the hearing, the Code of Conduct in effect at the time did not provide the reporting party with any opportunity to meaningfully participate in the hearing by providing evidence, witnesses, and opening or closing statement or an opportunity to question the witnesses. OCR also concludes that the University failed to obtain timely and relevant evidence for the hearing, including video recordings from the night of the incident, and relevant text messages. Last, the evidence reflects that [Whylie] was never provided with an equal opportunity to appeal the findings. As such, OCR concludes that the University failed to comply with the requirements of Title IX by denying [Whylie] an equitable investigation and resolution of her complaint of sexual assault.

(Id. at 19–20). On May 30, 2024, in accordance with the Resolution Agreement, the University offered to reimburse Whylie for "any out-of-pocket counseling costs [she] incurred during the academic years 2013–2014 and 2014–2015," subject to proof of payment. (Id. ¶ 86). Whylie rejected this offer on July 29, 2024. (Id. ¶ 87).

Having "diligently pursued the administrative remedial avenues available to her," (id. ¶ 88), Whylie filed a Complaint in this Court on May 30, 2025, alleging violations of the Equal Protection and Due Process Clauses of the Fourteenth Amendment (Counts I and II), violations of Title IX (Count III), negligence (Count IV), breach of contract (Count V), and intentional infliction of emotional distress (Count VI), (id. ¶¶ 89–145). She seeks declaratory and monetary relief as well as reasonable attorneys' fees and costs. (Id. at 29–30). Defendants filed a Motion to Dismiss on December 16, 2025. (ECF No. 32).[4] Whylie filed an Opposition on January 20, 2026, (ECF No. 35), and Defendants filed a Reply on February 19, 2026, (ECF No. 39).

## II.    DISCUSSION

### A.    Standards of Review

#### 1.    Rule 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) requires a plaintiff to establish the Court's subject-matter jurisdiction by showing the existence of either a federal question under 28

---

[4] Defendants first filed a Motion to Dismiss on December 15, 2026, but it contained errors in the table of contents. (Dec. 15, 2025 Mem. L. Supp. Defs.' Mot. Dismiss at 2, ECF No. 31-1). They filed a Corrected Motion to Dismiss the following day, (ECF No. 32), which is the Motion that the Court will reference throughout this Opinion.

U.S.C. § 1331 or diversity jurisdiction under 28 U.S.C. § 1332. A plaintiff may establish federal question jurisdiction by asserting a claim that arises from a federal statute or from the United States Constitution. Fed.R.Civ.P. 12(b)(1). To show that the claim arises on one of these bases, the federal question must appear "on the face of the plaintiff's properly pleaded complaint." AES Sparrows Point LNG, LLC v. Smith, 470 F.Supp.2d 586, 592 (D.Md. 2007) (quoting Caterpillar, Inc. v. Williams, 482 U.S. 386, 392 (1987)). When a party challenges subject-matter jurisdiction, however, the Court may consider "evidence outside the pleadings" to resolve the challenge. Richmond, Fredericksburg & Potomac R. Co. v. United States, 945 F.2d 765, 768 (4th Cir. 1991) (citation omitted).

A defendant challenging a complaint under Rule 12(b)(1) may advance a "facial challenge, asserting that the allegations in the complaint are insufficient to establish subject matter jurisdiction, or a factual challenge, asserting 'that the jurisdictional allegations of the complaint [are] not true.'" Hasley v. Ward Mfg., LLC, No. RDB-13-1607, 2014 WL 3368050, at *1 (D.Md. July 8, 2014) (quoting Kerns v. United States, 585 F.3d 187, 192 (4th Cir. 2009)). When a defendant raises a facial challenge, the Court affords the plaintiff "the same procedural protection as he would receive under a Rule 12(b)(6) consideration." Kerns, 585 F.3d at 192 (quoting Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982)). As such, the Court takes the facts alleged in the complaint as true and denies the motion if the complaint alleges sufficient facts to invoke subject-matter jurisdiction. Id.

### 2.    Rule 12(b)(6)

The purpose of a Rule 12(b)(6) motion is to "test[] the sufficiency of a complaint," not to "resolve contests surrounding the facts, the merits of a claim, or the applicability of

defenses." King v. Rubenstein, 825 F.3d 206, 214 (4th Cir. 2016) (quoting Edwards v. City of Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999)). A complaint fails to state a claim if it does not contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed.R.Civ.P. 8(a)(2), or does not "state a claim to relief that is plausible on its face," Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. Though the plaintiff is not required to forecast evidence to prove the elements of the claim, the complaint must allege sufficient facts to establish each element. Goss v. Bank of Am., N.A., 917 F.Supp.2d 445, 449 (D.Md. 2013) (quoting Walters v. McMahen, 684 F.3d 435, 439 (4th Cir. 2012)), aff'd, 546 F.App'x 165 (4th Cir. 2013).

In considering a Rule 12(b)(6) motion, a court must examine the complaint as a whole, accept the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. See Albright v. Oliver, 510 U.S. 266, 268 (1994); Lambeth v. Bd. of Comm'rs of Davidson Cnty., 407 F.3d 266, 268 (4th Cir. 2005). But the court need not accept unsupported or conclusory factual allegations devoid of any reference to actual events, United Black Firefighters of Norfolk v. Hirst, 604 F.2d 844, 847 (4th Cir. 1979), or legal conclusions couched as factual allegations, Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 555).

**B.      Analysis**

Defendants argue that the Eleventh Amendment bars Whylie's constitutional and state law claims against them and that her Title IX claim is untimely. (Mem. L. Supp. Defs.' Mot. Dismiss ["Mot. Dismiss"] at 7–13, ECF No. 32-1).[5] The Court will address each argument in turn.

**1.       State Law & Constitutional Claims – Eleventh Amendment Immunity**

First, Defendants argue that the Eleventh Amendment grants them immunity from Whylie's constitutional and state law claims. (Id. at 11). Whylie contends that these claims fall under an exception such that Defendants are not immune from suit. (Pl.'s Opp'n Defs.' Mot. Dismiss ["Opp'n"] at 26–27, ECF No. 35). For the reasons below, the Court agrees with Defendants.

"It is well established that a non-consenting state" and its agencies are "immune from a suit brought in a federal court by its own citizens" or by citizens of other states. Kuypers v. Comptroller of Treasury of Md., 173 F.Supp.2d 393, 395–96 (D.Md.) (citations omitted), aff'd sub nom. Kuypers v. Comptroller of Treasury for Md., 21 F.App'x 161 (4th Cir. 2001); Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 100 (1984) (holding that Eleventh Amendment immunity extends to state agencies and applies to suits brought by a state's own citizens as well as citizens of other states (citations omitted)). "This

---

[5] Defendants also argue that that Whylie fails to state a claim upon which relief may be granted as to her tort and contract claims and that those and her constitutional claims are time-barred. (Mot. Dismiss at 14–24). Because the Court finds that dismissal of these claims is warranted based on jurisdictional grounds, the Court declines to address these additional arguments.

jurisdictional bar applies regardless of the nature of the relief sought." Halderman, 465 U.S. at 100.

"There are three exceptions to Eleventh Amendment immunity": (1) when a state waives its immunity; (2) when Congress, acting under a "valid grant of constitutional authority," abrogates the states' immunity; and (3) when a suit challenges the actions of a state official as violative of federal law. Wicomico Nursing Home v. Padilla, 910 F.3d 739, 746 n.2 (4th Cir. 2018) (quoting Lee-Thomas v. Prince George's Cnty. Pub. Sch., 666 F.3d 244, 249 (4th Cir. 2012)). The third exception, developed by the Supreme Court in Ex Parte Young, 209 U.S. 123 (1908), "allows private citizens, in proper cases, to petition a federal court to enjoin State officials in their official capacities from engaging in future conduct that would violate the Constitution or a federal statute," Padilla, 910 F.3d at 746 (quoting Antrican v. Odom, 290 F.3d 178, 184 (4th Cir. 2002)). This exception, therefore, "does not apply when the alleged violation of federal law occurred entirely in the past," but rather when "(1) the violation for which relief is sought is an ongoing one, and (2) the relief sought is only prospective." Id. at 747 (first quoting DeBauche v. Trani, 191 F.3d 499, 505 (4th Cir. 1999), and then quoting Republic of Para. v. Allen, 134 F.3d 622, 627 (4th Cir. 1998)).

In this case, there is no dispute that the University and its Board (the "Institutional Defendants") are instrumentalities of the State of Maryland for immunity purposes. See Md. Code Ann., Educ. § 14-101(a)(2) ("The University is an instrumentality of the State . . . ."); id. § 14-102(a) ("The government of the University is vested in the Board of Regents."); Borkowski v. Balt. Cnty., 414 F.Supp.3d 788, 805–06 (D.Md. 2019) (finding

that University of Maryland Baltimore County—"a constituent institution of the University System of Maryland"—and its board of regents "are considered instrumentalities of the State for immunity purposes"); (see also Mot. Dismiss at 11; Opp'n at 26–27). The Institutional Defendants, therefore, are immune from suit unless an exception applies.

Maryland has not waived its sovereign immunity as to any suit arising under 42 U.S.C. § 1983, the statute under which Whylie brings her constitutional claims, (Compl. at 20, 22), nor has Congress abrogated Maryland's sovereign immunity under § 1983, Martin v. Maryland, No. PJM-16-2706, 2017 WL 3315274, at *3 (D.Md. Aug. 3, 2017). As to Whylie's tort and breach of contract claims, "the Maryland Tort Claims Act, Md. Code Ann., State Gov't § 12-101, et seq., effectuates a limited waiver of sovereign immunity to actions brought in state court, [but] it 'has no effect on the immunity afforded by the Eleventh Amendment for suits in federal courts.'" MediGrow, LLC v. Natalie M. LaPrade Med. Cannabis Comm'n, 487 F.Supp.3d 364, 373 (D.Md. 2020) (quoting Taylor v. Somerset Cnty. Comm'rs, No. RDB-16-0336, 2016 WL 3906641, at *5 (D.Md. July 19, 2016)); see also Stewart v. Morgan State Univ., No. DKC-11-3605, 2013 WL 425081, at *4 (D.Md. Feb. 1, 2013) ("While the State of Maryland has waived its sovereign immunity for certain breach of contract cases brought in State courts, see Maryland Code Ann., State Gov't § 12–201, the Legislature did not 'waive the State's Eleventh Amendment immunity in [contract] actions in Federal court.'" (quoting State v. Sharafeldin, 854 A.2d 1208, 1219 (Md. 2004))). The Ex parte Young exception, of course, does not apply to Whylie's claims against the University and the Board because they are not individuals being sued in their official capacities. P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc., 506 U.S. 139,

11

146 (1993) (The Ex parte Young exception "has no application in suits against the States and their agencies, which are barred regardless of the relief sought."). Thus, none of the three exceptions strips the Institutional Defendants of their sovereign immunity.

Chambers and Banks (the "Individual Defendants") also are entitled to Eleventh Amendment immunity because Whylie has sued them in their official capacities. (Compl. at 1–2); Halderman, 465 U.S. at 101–02; Weller v. Dep't of Soc. Servs. for City of Balt., 901 F.2d 387, 398 (4th Cir. 1990) ("[S]uit against the state officials acting in their official capacities is a suit against the State."); Borkowski, 414 F.Supp.3d at 806 (finding that Individual Defendants enjoyed sovereign immunity to extent plaintiffs sued them in their official capacities). For the same reasons as above, neither the waiver nor the abrogation exception applies to the Individual Defendants.

Whylie argues that the Ex parte Young exception strips Chambers and Banks of immunity because she seeks "forward-looking relief" for harms that "persisted well beyond" the 2014 disciplinary hearing. (Opp'n at 26). Whylie, however, requests retroactive monetary relief for the alleged constitutional violations, primarily. (Compl. at 21, 23). She adds a request under each § 1983 claim for "such other and further relief as the nature of the case requires including, but not limited to, declaratory and injunctive relief declaring the conduct which is the subject of the Complaint unlawful and unconstitutional and enjoining future unlawful and unconstitutional misconduct of the same type," (id.), but her ultimate request for monetary and declaratory relief centers on past conduct, (id. 29–30 (seeking compensatory and punitive damages and declaratory judgment regarding Defendants' handling of Whylie's sexual assault complaint and similar prior complaints)).

12

Moreover, the Complaint does not contain allegations of continuing or ongoing violations of Whylie's constitutional rights. Whylie, therefore, has not satisfied the two elements of the Ex parte Young exception, i.e., that "(1) the violation for which relief is sought is an ongoing one, and (2) [that] the relief sought is only prospective." Padilla, 910 F.3d at 747 (emphasis added) (first quoting DeBauche, 191 F.3d at 505, and then quoting Allen, 134 F.3d at 627).

At bottom, Whylie has not established that any of the three exceptions applies, and Defendants, therefore, are immune from Whylie's § 1983, tort, and breach of contract claims.

### 2. Title IX Claim – Statute of Limitations

Second, as to Whylie's Title IX claim, Defendants argue that this claim is barred by Maryland's statute of limitations on personal injury claims. (Mot. Dismiss at 7). Although courts generally do not rule on an affirmative defense, like the applicability of a statute of limitations, at the motion to dismiss stage, the Court may do so where "all facts necessary to the affirmative defense clearly appear on the face of the complaint." Goodman v. Praxair, Inc., 494 F.3d 458, 464 (4th Cir. 2007) (citation modified). The Court is satisfied that all facts necessary to determine whether Whylie's claims are time barred appear on the face of the Complaint and, therefore, will rule on Defendants' statute of limitations defense.

"Title IX does not contain an express statute of limitations . . . ." Wilmink v. Kanawha Cnty. Bd. of Educ., 214 F.App'x 294, 296 n.3 (4th Cir. 2007). Instead, courts borrow the relevant state's statute of limitations for personal injury claims, id. (citation

13

omitted), which, in this case, is three years, Md. Code Ann. Cts. & Jud. Procs. § 5-101. This the Parties do not dispute. (Mot. Dismiss at 7–8; Opp'n at 18).

Accrual of a Title IX claim, on the other hand, is governed by federal law, which provides that "a cause of action accrues when the plaintiff possesses sufficient facts about the harm done to [her] that reasonable inquiry will reveal [her] cause of action." Reid v. James Madison Univ., 90 F.4th 311, 319 (4th Cir. 2024) (quoting Nasim v. Warden, Md. House of Corr., 64 F.3d 951, 955 (4th Cir. 1995) (en banc)). Here, the Institutional Defendants argue that Whylie's Title IX claim accrued when she received the Notice of Decision on April 15, 2014. (Mot. Dismiss at 9).[6] Invoking the discovery rule, Whylie counters that her claim did not accrue until she received the OCR's investigation report on April 16, 2024, because the report contained information she did not previously have access to regarding the University's mishandling of sexual assault claims that other students brought prior to her assault in March 2014. (Opp'n at 18–21).

Under the discovery rule, which applies "absent a statutory directive to the contrary," a plaintiff's claim accrues only when they "know[] or should have known . . . their injury and its cause." Snyder-Hill v. Ohio State Univ., 48 F.4th 686, 698, 701 (6th Cir. 2022). In a case such as this, where a plaintiff sues a university, the question

---

[6] "[T]here is no individual liability under Title IX." Royal v. Kirschling, No. CCB-19-2825, 2020 WL 1849712, at *13 (D.Md. Apr. 13, 2020), aff'd, 835 F. App'x 699 (4th Cir. 2021); see also Fitzgerald v. Barnstable Sch. Comm., 555 U.S. 246, 257 (2009) (Title IX "has consistently been interpreted as not authorizing suit against school officials, teachers, and other individuals."). Thus, Whylie's Title IX claim can proceed only against the Institutional Defendants.

is when the plaintiff learned of the university's injurious conduct rather than the conduct of the alleged perpetrator of the sexual assault. Id. at 702 ("The institution's conduct is . . . 'the act providing the basis of' a plaintiff's legally cognizable Title IX injury." (quoting Garza v. Lansing Sch. Dist., 972 F.3d 853, 867 n.8 (6th Cir. 2020)). The answer to this question, in turn, depends on whether the plaintiff alleges post-assault or pre-assault deliberate indifference. Id. at 704. While "[a] plaintiff will typically know or have reason to know that a school mishandles their own report of an assault close to the time of the school's inadequate response," the plaintiff "may have no reason to know of a school's deliberate indifference that gave rise to their [pre-assault] heightened-risk claim" until much later. Id. (emphasis added).

In this case, Whylie labels her Title IX claim "pre-assault liability," (Compl. at 23), but she alleges both that the Institutional Defendants mishandled her complaint against Washington and that they "maintain[ed] a policy of deliberate indifference to reports of sexual misconduct, which created a heightened risk of sexual harassment," (id. ¶¶ 111–23). To the extent Whylie challenges the Institutional Defendants' mishandling of her complaint against Washington, Whylie admits in her Opposition that she "unquestionably knew in 2014 that she had been grievously harmed and that [the University's] handling of her case was deeply flawed." (Opp'n at 20); see V.E. v. Univ. of Md. Balt. Cnty., No. JRR-22-02338, 2023 WL 3043772, at *6 (D.Md. Apr. 21, 2023) (finding that plaintiff's post-assault deliberate indifferent claim accrued "no later than the Fall of 2018" after she reported sexual assault multiple times and university failed to address her complaints or concerns adequately), aff'd, No. 23-1955, 2024 WL 4563857 (4th Cir. Oct. 24, 2024), and aff'd, No.

23-1955, 2024 WL 4563857 (4th Cir. Oct. 24, 2024). While she may not have known the full extent of the Institutional Defendants' mishandling of her complaint, she had enough facts to discern the harm such that "a reasonable inquiry [would] reveal [her] cause of action." Nasim, 64 F.3d at 955; V.E., 2023 WL 3043772, at *3 ("Claim accrual does not require notice or knowledge of all underlying facts, but rather only 'sufficient facts about the harm done to [her] that reasonable inquiry will reveal [her] cause of action.'" (quoting Nasim, 64 F.3d at 955)). Thus, her post-assault claim accrued in April 2014 when she received the Notice of Decision.[7]

To the extent Whylie alleges pre-assault deliberate indifference, the accrual of her Title IX claim is more appropriately based on when she received the OCR's investigation report in 2024 because that report contained information that she previously did not know, and had no reason to know, regarding the University's mishandling of past sexual assault complaints. (See Compl. at 17–19 (OCR report finding "concerns that the University may have failed to provide an equitable grievance process for several other Title IX incidents reported in 2013 and 2014"; "[t]he University provided OCR with nine (10) [sic] case files of sexual harassment reports filed during 2013 or 2014 with the Student Judicial Affairs

---

[7] The doctrine of equitable tolling does not save Whylie's post-assault claim, despite the OCR's "prolonged administrative review," because Whylie was not required to exhaust her administrative remedies before suing. (Opp'n at 21–23, 25); McCarter v. Univ. of N.C. at Chapel Hill, No. 1:20-CV-1050, 2021 WL 4482983, at *7 (M.D.N.C. Sep. 30, 2021) ("[E]quitable tolling generally does not apply if exhaustion of administrative remedies was voluntary and not required."). The continuing violation doctrine also does not apply because Defendants' conduct giving rise to Whylie's post-assault claim had a fixed end: when the University adjudicated the matter in a disciplinary hearing in April 2014. (Opp'n at 24–25); Borkowski, 492 F.Supp.3d at 487.

Office, the Diversity and EEO Office or the University police"; and inadequacies related to handling of prior assault complaints)); see also Snyder-Hill, 48 F.4th at 702, 704–07 (finding that statute of limitations did not bar plaintiff's pre-assault, deliberate indifference claim because "a student must know that their school exposed them to a heightened risk of harassment before they have a viable claim," and plaintiffs did not have such information until well after the statute of limitations expired); Karasek v. Regents of U.C., 500 F.Supp.3d 967, 978 (N.D.Cal. 2020) ("[A] plaintiff's Title IX pre-assault claim accrues when the plaintiff knows or has reason to know of the school's policy of deliberate indifference that created a heightened risk of harassment."). Whether the Institutional Defendants' knowledge and mishandling of past complaints that involved different perpetrators satisfies the United States Court of Appeals for the Fourth Circuit's strict pre-assault deliberate indifference test is another question. See Facchetti v. Bridgewater Coll., 175 F.Supp.3d 627, 639–41 (W.D.Va. 2016) (citing Baynard v. Malone, 268 F.3d 228, 237–38 (4th Cir. 2001)). Defendants, however, do not challenge Whylie's Title IX claim for failure to meet this standard or failure to otherwise state a valid pre-assault claim,[8] and the Court will constrain its analysis accordingly.

---

[8] To state a pre-assault claim under Title IX, a plaintiff must allege that:

> (1) a school maintained a policy of deliberate indifference to reports of sexual misconduct, (2) which created a heightened risk of sexual harassment that was known or obvious (3) in a context subject to the school's control, and (4) as a result, the plaintiff suffered harassment that was "so severe, pervasive, and objectively offensive that it can be said to [have]

### III.    CONCLUSION

For the foregoing reasons, the Court will GRANT Whylie's Motion for Leave to File in Excess of Thirty Pages, (ECF No. 36), and will GRANT IN PART and DENY IN PART Defendants' Motion to Dismiss, (ECF No. 32). The Institutional Defendants will be directed to answer Whylie's Complaint (ECF No. 1) as to her pre-assault claim under Title IX in accordance with the Federal Rules of Civil Procedure and the Local Rules of this Court. A separate Order follows.

Entered this 8th day of May, 2026.

_____/s/_____
George L. Russell, III
Chief United States District Judge

---

deprive[d] the [plaintiff] of access to the educational opportunities or benefits provided by the school."

Karasek, 500 F.Supp.3d at 112 (quoting Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ., 526 U.S. 629, 650 (1999))